UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Michael R. Donlon

      v.                                Civil No. 10-cv-559-PB

James O'Mara, Superintendent,
Hillsborough County Department
Of Corrections

## REPORT AND RECOMMENDATION

Michael Donlon filed "Expedited Motion for Transfer of Sentence" (doc. no. 9) seeking to be moved to another jail, alleging that he is not receiving constitutionally adequate medical care at the Hillsborough County House of Corrections ("HCHC"), and that he will suffer irreparable harm as a result if this Court does not interfere.  Judge Barbadoro construed the motion as a request for preliminary injunctive relief and referred it to this magistrate judge (doc. no. 10) for consideration and a recommendation.  A hearing was held on the motion on January 3, 2011.

After consideration of all of the testimony and evidence presented, the Court recommends that Donlon's motion be denied.  As explained fully herein, Donlon, a diabetic inmate at the HCHC, demonstrated at the hearing that he had been placed in maximum security, and that that placement created a significant risk of serious harm to him.  Specifically, and as described in

more detail below, the testimony and evidence at the hearing demonstrated that in maximum security, Donlon's blood sugar frequently dropped dangerously low, and that due to the conditions and regulations in place for maximum security inmates, Donlon's blood sugar levels could not be consistently or adequately monitored and controlled in a timely fashion.  At the hearing, however, HCHC Assistant Superintendent David Dionne credibly expressed his willingness to remove Donlon from maximum security upon Donlon's agreement to behave in a manner consistent with his health and safety, and to refrain from engaging in behavior that is contraindicated for his medical condition.

After the hearing, the Court ordered the parties to supplement the record (doc. no. 19) to indicate what progress had been made toward entering into an agreement to move Donlon out of maximum security, and to provide additional medical records (doc. no. 19).  The defendants filed a response to that Order that included documentation of an agreement entered into between Donlon and Dionne to move Donlon off of maximum security.  Doc. 20-1.  The responsive filings also indicted that Donlon had, in fact, been moved off of maximum security.  See Docs. 20-1 & 21.  Because of Dionne's willingness to immediately remedy the conditions that, at the time of the hearing, were creating a serious risk of harm to Donlon, and because he

2

followed through in creating a contract with Donlon to house him outside of maximum security, the risk of harm to Donlon caused by his placement in maximum security has been alleviated.  The Court cannot find, therefore, that Donlon will be irreparably harmed absent an injunction.  As such irreparable harm is a necessary showing for the issuance of a preliminary injunction, the Court recommends that Donlon's motion for preliminary injunctive relief (doc. no. 9) be denied without prejudice to refiling in the event Donlon is again subjected to a serious risk of harm justifying injunctive relief.

<u>Background</u>

1.   <u>March 30, 2010 – October 27, 2010: Before Elliot Hospital</u>

Michael Donlon is a sentenced inmate who has been housed at the HCHC since on or about March 30, 2010.  <u>See</u> <u>Medical Record</u> ("Med. R.")[1] (Intake Questionnaire 3/30/10).  Prior to his stay at the HCHC, Donlon was incarcerated at the Rockingham County House of Corrections, where he was receiving Glucophage, a medication used to treat Type II diabetes or pre-diabetes.  <u>Id.</u>

---

[1]Donlon's medical record was submitted to the Court by defendants in advance of the January 3, 2011, hearing.  The entire record is docketed in this case (document no. 16).  At the hearing in this matter, the Court accepted the entire medical record as evidence, but neither side had the records marked as a specific exhibit.  Accordingly, documents in the medical record will be cited as "Med. R." followed by a parenthetical identifying particular documents relied on.

That medication was initially continued upon Donlon's admission to the HCHC.  Id.

On April 26, 2010, Donlon was seen and evaluated by the jail physician, Dr. Matthew Masewic.  Med. R. (Physician's Order ("MD Ord") 4/26/10).  Dr. Masewic testified at the January 3, 2011, hearing that a "fasting blood sugar," or first morning blood sugar level of 100-120 indicates pre-diabetes, and that a fasting blood sugar consistently over 120 is diagnosed as diabetes.  Donlon's medical records demonstrate that his fasting blood sugar in the first week of April 2010 was between ninety-three and 120.  Med. R. (Medication Administration Records ("MARs") 4/1/10 – 4/4/10).

Dr. Masewic testified that because Donlon did not present with a clear diabetes diagnosis, he discontinued Donlon's Glucophage.  Dr. Masewic further ordered that Donlon's fasting blood sugar be tested weekly for four weeks.  Med. R. (MD Ord 4/26/10).  Dr. Masewic testified that he advised Donlon generally that he could control pre-diabetes with a low-carbohydrate diet and exercise.  The extent of the information provided to Donlon in that meeting regarding specific food choices is not clear in the record.  Donlon testified that he was, at that time, not given specific instructions about how to control his blood sugar level with diet.  Donlon further testified that after his April 26, 2010, appointment with Dr.

4

Masewic and the discontinuation of the daily Glucophage prescription, it was his understanding that he did not have diabetes.

Beginning on April 28, 2010, Donlon complained a number of times to the HCHC Medical Department that his right leg was swollen although he had not suffered any injury.  Med. R. (Health Services Request Form ("HSRF") 4/28/10).  On April 28, 2010, a nurse's note in Donlon's file indicated that Donlon's ankle was swollen, he complained of low blood sugar, that he had no history of an ankle injury, and that he did not have diabetes.  Med. R. (Nursing Assessment ("NA") 4/28/10).  The record reflects that Donlon complained to the HCHC Medical Department about pain and/or swelling in one or both of his legs on: April 28, May 3, May 6, July 10, July 18, August 1, and August 3.  Med. R. (HSRFs 4/18/10, 4/28/10, 7/10/10, 8/1/10, 8/3/10; NAs 4/28/10, 5/3/10, 7/18/10, 8/1/10; Progress Note ("PN") 5/6/10).

Donlon also complained to the HCHC Medical Department that he was experiencing headaches and dizziness on May 4, August 19, September 26, September 29, October 3, and October 27.  Med. R. (HSRFs 5/4/10, 8/19/10, 9/26/10, 10/3/10, 10/28/10; NAs 5/4/10, 10/3/10; PN 10/28/10).  Donlon repeatedly requested medical attention, including an appointment with the HCHC physician and medication to address his leg pain and swelling and headaches.

Med. R. (HSRFs 4/18/10, 4/28/10, 5/4/10, 7/10/10, 8/1/10, 8/3/10, 8/19/10, 9/26/10, 10/3/10, 10/28/10; NAs 4/28/10, 5/3/10, 5/4/10, 7/18/10, 8/1/10, 10/3/10; PNs 5/6/10, 10/28/10). The testimony at the hearing revealed that Donlon saw Dr. Masewic several times between April 26, 2010, and July 2010, but Donlon claimed that Dr. Masewic refused to address all of his medical complaints during those appointments.  Donlon was treated with Tylenol, and given instructions to wear his glasses and elevate his swollen legs.  Med. R. (NAs 7/11/10, 8/1/10, 10/3/10); Nurse's Note on HSRF ("NN") 9/29/10).

Between April 2010 and October 2010, Donlon had access to the HCHC commissary and routinely ordered foods high in sugar and carbohydrates which, according to the testimony at the hearing, are contraindicated for someone with diabetes.  Def. Ex. 11.  Donlon, however, believed he did not have diabetes at that time, and there is no evidence that the HCHC either regulated his commissary intake or placed him on an available diabetic or calorie-restricted diet.  Donlon's medical record reveals occasions during this time period when he requested snacks or glucose tablets from the HCHC Medical Department, to consume when his blood sugar was low.  Med. R. (PN 3/30/10; HSRFs 4/28/10, 5/1/10, 7/23/10).  Also, during this time, Donlon was medically restricted from exercise by other physical problems.  Med. R. (Health Services Medical Passes 4/28/10,

9/22/10, 10/1/10, 10/28/10; HSRF 6/18/10; NN 6/1/10; NA
6/18/10).

On September 17, 2010, Donlon's cell was searched.  Def.
Ex. 9.  Just before his cell was searched, an officer noted that
Donlon flushed a small item down the toilet.  Id.  Donlon
testified at the hearing that he told the officer conducting the
search that it was a note containing names of inmates to whom he
owed commissary products and that he flushed the note because
trading in commissary items was against HCHC rules, and he did
not want to get other inmates in trouble.  Id.  Donlon was
charged in a disciplinary report with, and found guilty of,
abusing commissary.  Id.

On October 27, Donlon complained to the HCHC Medical
Department of a severe headache.  Pl. Exs. C, C-1; Med. R. (PN
10/28/10).  Donlon requested that his blood sugar level be
checked.  Pl. Exs. C, C-1.  On October 28, Donlon's blood sugar
was very high, although the exact level at that time is not in
evidence.  Med. R. (PN 10/28/10).  Over the phone, Dr. Masewic
ordered medication to be given to Donlon, but Donlon's blood
sugar could not be lowered by oral medication alone.  Med. R.
(MD Ord 10/28/10).  When his blood sugar could not be regulated
at the HCHC, Dr. Masewic instructed the HCHC Medical Department
nurses to have Donlon sent to the emergency room at the Elliot
Hospital.  Id.

2.    October 28 - 30, 2010: Elliot Hospital

On October 28, 2010, Donlon was sent to the hospital and admitted.  Med. R. (PN 10/29/10).  Donlon started to receive injected insulin at the hospital.  Med. R. (MD Ords 10/30/10; Hospital Discharge Form ("Discharge") 10/30/10).  During Donlon's hospital stay, the internist and endocrinologist responsible for his care determined that Donlon likely had Type I diabetes and would need to take injected insulin to control his blood sugar levels.  Med. R. (Discharge 10/30/10).  Donlon testified that at the hospital he was, for the first time, educated in specific ways to manage his diet to control his diabetes.  Donlon was instructed to "carb count," meaning that he could eat whatever he wanted, as long as he stayed within a particular carbohydrate count each day.  At the hearing, Dr. Masewic confirmed that any food combination that did not exceed Donlon's carbohydrate and calorie limit would satisfy the requirements of his diabetic diet.

3.    October 30, 2010 - November 12, 2010: HCHC Medical Unit

When Donlon returned to the HCHC on October 30, 2010, he was housed in the HCHC medical unit.  When he left the hospital, Donlon's blood sugar levels were in the 200s.  Med. R. (Discharge 10/30/10).  He was prescribed injectable insulin to be adjusted based on his blood sugar levels.  Id.  On October

31, Donlon's blood sugar was between 280 and 295 until 10:00 p.m., when his blood sugar registered at 420.  Med. R. (MAR 10/31/10).

On November 1, Donlon's blood sugars were between 264 and 350 until 7:30 p.m., when his blood sugar was 493.  Med. R. (11/1/10; PN 11/1/10).  Donlon reported to a nurse that he had eaten a donut that he had purchased from the HCHC commissary prior to going to the hospital.  Med. R. (PN 11/1/10).  Donlon, at that time, stayed in the medical unit.  No further difficulties with inappropriate food choices appear in the record during the remainder of his stay on the medical unit.

Between November 2 and November 7, Donlon's blood sugar registered between 165 and 397 while his body adjusted to the insulin he was receiving.  Med. R. (MARs 11/2/10-11/1/10).  On November 8, 2010, Donlon's blood sugar began to register more consistently in the middle to high 100s.  Med. R. (MARs 11/8/10-11/11/10).

On November 8, Donlon placed his only post-hospital commissary order.  Def. Ex. 11.  This order contained some high-carbohydrate foods, but no sugary snacks, with the exception of two single-serving jelly packets.  Id.  Donlon testified he ordered the jelly packets to use up the funds in his inmate account so that he would qualify as indigent for the following week, which apparently comes with some benefit at the HCHC.

9

Donlon also testified his intention in ordering food was to substitute the commissary food for HCHC-provided food that he did not like.

While Donlon was on the HCHC medical unit during the first week and a half of November, he filed a grievance form on November 7 and November 10, and two on November 11.  Def. Exs. 12, 13, 14, 15; Pl. Ex. B.  The gist of three of the grievances was that actions of the HCHC medical department caused the acute diabetic episode Donlon experienced at the end of October and a permanent worsening of his medical condition, in the following ways: (1) failing to attend to and properly identify his symptoms in the months preceding his hospitalization; (2) Dr. Masewic's refusal to see Donlon after July 29; and (3) the discontinuation of his medication based on misinformation regarding the September 17 incident.  Def. Exs. 12, 13, 15; Pl. Ex. B.  The fourth grievance, relating to confidentiality in medical information, was resolved informally and withdrawn. Def. Ex. 14.  Both HCHC Medical Department Administrator Denise Ryan and Dionne responded to each of the grievances, stating that Donlon had refused blood sugar checks in June and had failed to complain about diabetes after that.  Def. Exs. 12, 13, 15; Pl. Ex. B.  The responses stated that Donlon was now being treated, so no further action would be taken.  Id.

4.  <u>November 12, 2010 – January 5, 2011: Maximum Security</u>

On November 12, 2010, Dionne ordered that Donlon be transferred to the HCHC's maximum security unit.  Def. Exs. 16, 17; Pl. Exs. C, C-1, D, E.  Dionne told Donlon, and testified at the hearing, that the move was due to Donlon's consumption of a donut on November 1, as well as his previous improper trading of commissary items, and the resulting need for Donlon to be housed in a unit where neither he nor any other inmate on the unit had access to commissary food.  Def. Ex. 18; Pl. Ex. E.  In this way, Dionne testified, Donlon's food intake could be monitored and controlled.

Over the course of the several weeks following Donlon's transfer to maximum security, as his body adjusted to the insulin, Donlon's blood sugar continued to decrease.  Med. R. (MARs 11/13/10-11/30/10).  On November 15, for the first time, Donlon's blood sugar level was recorded below 80, at 78, during the afternoon.  Def. Ex. 18; Pl. Ex. E; Med. R. (MAR 11/15/10; PN 11/15/10).  At the hearing, Donlon described his low blood sugar symptoms as including headaches, and feeling extremely ill, weak, and shaky.  Donlon stated that the ability to eat quickly upon feeling the onset of those symptoms is necessary to properly manage his blood sugar drops.

Donlon's blood sugar dropped below 80 again on November 19 (blood sugar was 71 at 4:00 p.m.).  Med. R. (MAR 11/19/10).

Thereafter, Donlon's blood sugar levels registered as follows: November 22 (blood sugar was 66 at 1:40 p.m.); November 27 (blood sugar was 77 at 3:15 p.m. and 75 at 3:35 p.m.); November 28 (blood sugar was 71 at 4:00 p.m.), and November 30 (blood sugar was 67 at 6:00 a.m.).  Med. R. (MARs 11/22/10, 11/27/10, 11/28/10, 11/30/10).

Dr. Masewic testified that a blood sugar level of 70 "is about as low as you want to get," and that a blood sugar level below 60 would make the HCHC medical staff "really get concerned."  Dr. Masewic further testified that any diabetic with a blood sugar level below 60 is in danger of going into insulin shock.  The HCHC medical staff appears to have become concerned with raising Donlon's blood sugar when his levels got down near 70, as the evidence presented at the hearing was that Donlon was consistently provided with a snack or juice when the medical staff became aware that his blood sugar was that low. Def. Ex. 18; Pl. Exs. C, C-1, E; Med. R. (PNs 11/13/10, 11/15/10, 12/4/10, 12/13/10; MARs 11/22/10, 11/27/10).

On November 23, 2010, Donlon filed a grievance form complaining about his classification to maximum security.  Def. Ex. 16; Pl. Ex. D.  Dionne responded to the grievance, stating that Donlon was placed on that unit for his health and the necessity of limiting Donlon's direct and indirect access to commissary food.  Id.

On November 29, Donlon again requested to be transferred out of maximum security.  Def. Ex. 17.  Donlon was told that he was placed in maximum security by Dionne.  Id.  Dionne met with Donlon and told Donlon that he had, in fact, placed Donlon in maximum security for his own safety, and that he would continue to house him there to insure that his food intake was controlled.  Def. Ex. 18; Med. R. (PN 12/1/10).

Donlon was in maximum security for the entire month of December 2010.  The medical records provided by the HCHC to the Court indicate that Donlon's blood sugar levels registered as follows: December 4 (blood sugar was 65 at 2:00 p.m. and he was given juice); December 6 (complained of low blood sugar at 6:20 p.m.); December 14 (blood sugar was 58 at 2:15 p.m. and he was given juice).  Def. Ex. 18; Pl. Exs. C, C-1, E; Med. R. (PN 12/4/10, 12/6/10).

The HCHC did not provide the Court with complete medical records at or before the hearing concerning Donlon's blood sugar levels for the month of December, but Donlon himself kept logs of his blood sugar levels during much of that time.  Pl. Exs. C, C-1.  The Court ordered that the HCHC provide additional medical records for December 2010 (doc. no. 19), and while some progress notes and other documents were provided in response to that order (doc. no. 20), no accounting of Donlon's blood sugar levels over the course of that month was included in the records

provided.  The accuracy of Donlon's logs, therefore, has not been disputed by the defendants.  A review of Donlon's log indicates that Donlon's blood sugar regularly dropped to concerning levels (i.e., below 70):

| | |
|---|---|
| December 12 | 3:00 p.m. Donlon feels blood sugar is low |
| | 3:45 p.m. Donlon taken to HCHC Medical |
| December 14 | 2:45 p.m. blood sugar = 61 |
| | 2:55 p.m. given juice |
| December 15 | 12:00 a.m. blood sugar = 71, given apple |
| | 3:50 p.m. blood sugar = 77-79, given juice |
| December 16 | 3:40 p.m. blood sugar = 55 |
| December 17 | 3:55 p.m. blood sugar = 67 |
| December 18 | 4:05 p.m. blood sugar = 67 |
| December 19 | 4:25 p.m. bad headache due to low blood sugar |
| December 21 | 3:45 p.m. blood sugar = 69 |
| December 22 | 3:45 p.m. blood sugar = 69 |
| December 23 | 5:15 a.m. requested medical care-low blood sugar |
| | 5:55 a.m. told officer blood sugar dropping |
| | 6:00 a.m. drank milk |
| | 6:05 a.m. blood sugar checked |
| | 3:30 p.m. blood sugar = 56 |
| December 24 | blood sugar = 51 |
| December 28 | 3:25 p.m. blood sugar = 61, given juice |
| | 4:00 p.m. blood sugar = 117 |

December 29    3:30 p.m. blood sugar = 56, given juice

December 30    3:35 p.m. blood sugar = 61, given juice

January 1      2:25 p.m. blood sugar = 58

Pl. Exs. C, C-1.  The evidence shows that in November and December 2010, while housed in maximum security, Donlon's blood sugar dropped to the 60s and 70s at least seventeen times, and dropped below 60, placing Donlon in danger of insulin shock, at least five times.  Id.

On December 15, Donlon again filed a grievance, complaining that he had been suffering from low blood sugar levels and was unable to regulate his blood sugar level himself, as he lacked access to food, and was unable to consistently get quick medical attention while he was housed on maximum security.  Def. Ex. 20. Donlon requested an "informal resolution" so that he could be returned to the general inmate population.  Id.  Ryan responded to Donlon that his blood sugar levels were within normal limits. Id.  That assertion by Ryan was not supported by the evidence presented at the hearing or in the defendants' supplemental filings.  Dionne also responded to Donlon, again stating that Donlon was better off in maximum security, and that he would remain on that unit.  Id.

Dionne testified at the hearing that the officers in maximum security make rounds of inmate cells, where the inmates are locked in, every fifteen minutes.  Accordingly, when Donlon

feels his blood sugar level is getting low, it can take up to
fifteen minutes for him to get the attention of an officer to
tell them he is in need of medical attention.  On two occasions,
December 12 and December 23, it took forty or more minutes for
Donlon to receive medical attention because he was unable to get
the attention of the officers on the unit.  Pl. Exs. C, C-1.
There is no evidence in the record of any occasion in which
Donlon requested a snack or complained of low blood sugar and
was found to be misrepresenting his symptoms.

At the hearing, Dionne testified that there is a much
smaller inmate-to-officer ratio on the HCHC maximum unit than on
the general population units, and, in his opinion, Donlon has
adequate access to staff while on that unit.  There is also,
however, no evidence in the record that Dionne has any medical
training, or that he could determine what response time would be
deemed medically appropriate for a low blood sugar complaint in
a diabetic person.

Defendants opined at the hearing that Donlon is not serious
about cooperating with his own health care on the basis of the
following: Donlon's commissary purchases made before his
admission to the hospital; the November 1, 2010, "donut
incident"; and his failure to complain that he was suffering
from high blood sugar prior to October 27, 2010.

16

The assertion that Donlon failed to complain about high blood sugar prior to October 27, 2010, is not borne out by the evidence.  While Donlon did not complain, by name, about diabetes or high blood sugar between June 2010 and October 27, 2010, he did, on numerous occasions, complain to the medical personnel of severe headaches and leg swelling without a causal injury.  Pl. Exs. C, C-1; Med. R. (PN 10/28/10, HSRFs 4/18/10, 4/28/10, 5/4/10, 7/10/10, 8/1/10. 8/3/10, 8/19/10, 9/26/10, 9/29/10, 10/3/10, NAs 4/28/10, 5/3/10, 5/4/10, 5/6/10, 7/18/10, 8/1/10).  Donlon testified that while at the Elliot Hospital, he learned that both of those symptoms were likely caused by his diabetes, and that his blood sugar had likely been very high for several months prior to his October 28, 2010, hospital admission.

Once released from the Elliott Hospital, Donlon's commissary purchase of November 8, 2010, compared with his pre-hospital purchases, reflects a relative dearth of "sweets."  See Def. Ex. 11.  Although Donlon did, admittedly, eat a donut on November 1, and order commissary foods containing carbohydrates on November 8, id.; Med. R. (PN 11/1/10), he testified credibly that he did so with the understanding that any carbohydrates consumed up to a certain limit were allowable, regardless of the source, so long as he did not exceed his daily allotment.  Donlon testified that it was his practice, prior to being housed

in the maximum security unit, to sometimes forego HCHC-prepared meals in favor of commissary purchases, and that it was his intention to do the same with his November 8 commissary purchases.  Dr. Masewic testified that this practice was acceptable on Donlon's diet if the substitutions did not result in an overall increase in carbohydrate intake.

Donlon further testified that he received counseling regarding diabetes and a diabetic diet for the first time at Elliott Hospital.  Although the medical records reflect that the HCHC had provided some information to Donlon regarding diabetes, Med. R. (PNs 4/7/10, 4/23/10, 11/1/10, 11/11/10, 12/1/10), the only evidence presented regarding the substance of that information was that Dr. Masewic, while telling Donlon that he did not have diabetes, told him also that he could exert some control over his blood sugar levels and blood pressure with a low carbohydrate diet and regular exercise.  There is nothing in the record that demonstrates that Donlon was counseled or instructed regarding how to accomplish that goal in jail, as he was on an exercise restriction and was only able to choose his own food or know the content of the food he was eating if he purchased commissary products.

Furthermore, although diabetic meals are available at the jail, as evidenced by Dr. Masewic placing Donlon on a restricted-calorie diabetic diet after his hospitalization, no

18

medical staff member placed Donlon on a diabetic diet prior to
his hospitalization or otherwise restricted his food intake.
Denise Ryan testified that when she has concerns about an
inmate's food intake or choices, she obtains a copy of the
inmate's commissary orders and that she will, if she finds their
commissary orders contain unhealthy food choices, go to the
inmate and discuss healthier food choices.  Ryan testified she
obtained Donlon's November 8, 2010, commissary order and found
it to be of concern, but did not discuss it with Donlon.  Ryan
did not indicate that she ever previously obtained any of
Donlon's commissary orders out of concern for his food choices,
and she stated she has never personally engaged in or been
present for any counseling or education with Donlon, but
presumed Donlon had learned about how to appropriately control
his diet, as his medical records indicate that he received
"diabetic education" at the jail.

### Discussion

In considering a motion for a preliminary injunction, a
district court must consider: "(1) the plaintiff's likelihood of
success on the merits; (2) the potential for irreparable harm in
the absence of an injunction; (3) whether issuing an injunction
will burden the defendants less than denying an injunction would
burden the plaintiffs; and (4) the effect, if any, on the public

interest."  Boston Duck Tours, LP v. Super Duck Tours, LLC, 531
F.3d 1, 11 (1st Cir. 2008) (quotation marks and citations
omitted).  "The first two factors are the most important and, in
most cases, 'irreparable harm constitutes a necessary threshold
showing for an award of preliminary injunctive relief.'"
Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009)
(quoting Charlesbank Equity Fund II, LP v. Blinds To Go, Inc.,
370 F.3d 151, 162 (1st Cir. 2004)).

        To demonstrate the prospect of future harm that could be
prevented by an injunction, a plaintiff must show more than
previous injury due to an unlawful practice.  See Gonzalez-Droz,
573 F.3d at 79; Steir v. Girl Scouts of the USA, 383 F.3d 7, 16
(1st Cir. 2004).  "Past exposure to illegal conduct does not in
itself show a present case or controversy regarding injunctive
relief . . . if unaccompanied by any continuing, present adverse
effects."  Steir, 383 F.3d at 16 (quotation marks and citations
omitted).  "The burden of demonstrating that a denial of interim
relief is likely to cause irreparable harm rests squarely upon
the movant."  Charlesbank Equity Fund II, 370 F.3d at 162.

        Here, Donlon has made a strong showing that, were he to
remain in maximum security under circumstances as they were
described at the hearing, he would suffer a risk of serious
harm.  The evidence was undisputed that Donlon has Type I
diabetes, Med. R. (Discharge 10/30/10), that he is taking

insulin, id., and that in the six weeks before the hearing,
Donlon's blood sugar level dropped below seventy at least
sixteen times and below sixty at least six times.  Def. Ex. 18;
Pl. Exs. C, C-1, E; Med. R. (MARs 11/26/10, 11/30/10; PNs
12/4/10, 12/13/10).  On each of those occasions, Donlon was in
danger of going into insulin shock.

The evidence before the Court indicates that Donlon's
assessment of when his blood sugar is low tends to be accurate –
there are no instances in the medical records or elsewhere in
the record where Donlon complained of low blood sugar and his
blood sugar test was normal.  On the occasions when he received
medical attention within fifteen minutes, he was given juice or
an apple and regained a normal blood sugar level.

The undisputed evidence showed that, on at least two
occasions in December, Donlon had to wait forty or more minutes
for medical attention when he felt his blood sugar was
dangerously low.  Pl. Exs. C, C-1.  The testimony of Ryan and
Dionne also made clear that Donlon does not have access to any
means with which he can regulate his own blood sugar while he is
housed in maximum security.  Donlon therefore relies, for his
health and safety, entirely on his ability to get the attention
of an officer in a timely fashion when he feels his blood sugar
is dropping, or has dropped, too low.  Because of the
potentially dire consequences of insulin shock and the lack of

certain access to medical care as needed, it appears that remaining in maximum security, with no access to commissary or glucose tablets, and no ability to keep a carton of juice or piece of fruit in his cell would present a significant risk of serious harm to Donlon's health and safety.

At the hearing, however, Dionne credibly expressed not only a willingness, but a strong desire to enter into an agreement to move Donlon off of the maximum security unit.  The additional information provided to the court by the defendants after the hearing demonstrates that Dionne promptly entered into such a contract with Donlon on January 5, 2011, and that Donlon is now being housed in another unit.  Doc. No. 20-1.  It appears that Donlon therefore holds the key to staying out of the maximum security unit.  If Donlon maintains his agreement to act in a manner consistent with his health and safety, to cooperate with the medical department, and to obey institutional rules -- all reasonable expectations for any inmate and well within Donlon's power to meet -- it appears he will not be housed in the maximum security unit.  Accordingly, there appears to be no continuing risk of serious harm, and no need for this Court to order injunctive relief to prevent future harm to Donlon.  The court therefore finds that Donlon has not met his burden to show that he would suffer irreparable harm absent the issuance of an injunction.  Because irreparable harm is "a necessary threshold

showing for an award of preliminary injunctive relief,"
Charlesbank Equity Fund II, 370 F.3d at 162, the Court need not
consider the other preliminary injunction factors.  See id. at
163 (approving denial of preliminary injunction upon movant's
failure to demonstrate irreparable harm); Biogen Idec MA Inc. v.
Trs. of Columbia Univ., 332 F. Supp. 2d 286, 296 (D. Mass. 2004)
("no matter how strong the likelihood of success, some
irreparable harm in the absence of an injunction must be
proven") (citing EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st
Cir. 1996)).

Conclusion

For the foregoing reasons, the Court recommends that the
District Judge enter findings consistent with this report and
deny the motion for a preliminary injunction (doc. no. 9).  The
denial of the injunction should be without prejudice to renewal
by the plaintiff should Donlon again be housed under
circumstances posing a risk of serious harm to his health and
safety.

Any objections to this Report and Recommendation must be
filed within fourteen (14) days of receipt of this notice.  See
28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2).  Failure to file
objections within the specified time waives the right to appeal
the district court's order.  See Sch. Union No. 37 v. United

23

Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:   February 8, 2011

cc:  Michael Donlon, pro se
     Carolyn Kirby, Esq.

LBM:jba